**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RACHEL K. BISSETT** | § | **PLAINTIFF** |
| | § | |
| **v.** | § | **Civil Action No. 1:10cv99-LG-RHW** |
| | § | |
| **BEAU RIVAGE RESORTS, INC.** | § | **DEFENDANT** |

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BEFORE THE COURT** is the Motion for Summary Judgment [43] filed by
Beau Rivage Resorts, Inc. Upon reviewing the submissions of the parties and the
applicable law, the Court finds that Beau Rivage is entitled to summary judgment with
regard to all of Rachel K. Bissett's claims.

### FACTS

Rachel Bissett, a Caucasian female, began working at the Beau Rivage casino
in Biloxi, Mississippi, on November 16, 1998. (Am. Compl. at 2; Ex. A to Pl.'s Resp.)
During most of her employment, she served as the manager of the count room, which
is where the casino's money is collected and counted. She oversaw the count room
supervisor, the count room leads, and other count room employees. On July 2, 2007,
she submitted a memorandum to the Human Resources department in which she
reported that a male subordinate employee, Billy Budnick, had made sexually
degrading comments about her intimate relationship with her husband. (Ex. 11 to
Def.'s Mot.) Bissett was not present when the comments were made, but she learned
about the comments while she was investigating Budnick for allegedly becoming angry
and walking off the job. (*Id.*) She was viewing surveillance video of Budnick's

interactions with other employees on the day he walked out, and the surveillance tape captured the sexual comments. (*Id.*)   Budnick was suspended pending an investigation. (*See* Ex. 12 to Def.'s Mot.)

When Bissett's statement was taken during the investigation, she informed Human Resources that she viewed Budnick as a threat due to his anger issues and she feared he would bring a gun to work. (Ex. 12 to Def.'s Mot. at 445).   Human Resources investigated not only Budnick's conduct but also whether Bissett's management style encouraged sexual comments.   (Ex. 12 to Def.'s Mot.)   In their statements, some employees claimed that Bissett cursed, made statements of a sexual nature, and over-managed her employees. (*Id.*)  Beau Rivage determined that there was no support for Bissett's claim of sexual harassment, but it found that Budnick's anger over not being given a job in another department created a hostile work environment.   (Ex. I to Pl.'s Resp.)   The memorandum concerning the investigation noted that some employees stated that sexual conversations in the count room were initiated by Bissett.   (*Id.*)

At her deposition in the present case, Bissett testified that Budnick stopped making sexual comments about her after the investigation, but his anger continued to be an issue.   (Ex. 13 to Def.'s Mot. at 201; Ex. E to Pl.'s Resp. at 203-04).   She also testified that she stopped making comments of a sexual nature after the 2007 investigation.   (Ex. E to Pl.'s Resp. at 133).   She further stated that Human Resources told her after the 2007 incident that Budnick could feel that he was able to get away with making sexual comments, because she had made sexual comments on other occasions; thus she felt that they directed that investigation toward her and tried to

make everything her fault. (*Id.* at 197, 199).

In approximately April of 2009, the count room supervisor, Michael Bonayog, made complaints about Bissett to her supervisor, Glenn Ellis, who is the casino controller. (Ex. 10 to Def.'s Mot. at 7, 13; Ex. 33 to Def.'s Mot.)  It is undisputed that Bonayog is an Asian/African-American male who is younger than Bissett.  Ellis recalled at his deposition that Bonayog stated that he did not like the way Bissett treated him. (Ex. 10 to Def.'s Mot. at 13-14)  Bonayog also claimed that Bissett made various comments about her subordinate employees, some of which were age-related, some of which were sex-related, and others that were race-related. (*Id.* at 14).  Ellis contacted Human Resources about these complaints. (*Id.* at 14-15).  Nevertheless, Ellis testified that he was caught off-guard by what Bonayog said, because Bissett had promoted Bonayog to his current position, and Bissett had always been complimentary of Bonayog. (*Id.* at 16-17).

On April 17, 2009, Bissett was placed on suspension pending investigation. (Ex. 16 to Def.'s Mot.)  She was told that she should not "contact any of her employees or anyone else unless instructed to do so by Employee Relations." (*Id.*; Ex. 13 to Def.'s Mot. at 45).  Bissett admits that she contacted one of her employees twice and one of Glenn Ellis' employees once. (Ex. 13 to Def.'s Mot. at 45-52).  She claims that she was contacting them regarding matters such as logging out of her computer, de-activating her log-in information, and determining why an employee was working on a Monday because Human Resources had been questioning her about overtime. (*Id.*)  Bissett's

husband also contacted one of her employees, but she did not learn about that until later. (*Id.* at 52).

During the investigation, several of the employees gave very similar statements in which they claimed that Bissett made numerous offensive remarks concerning sex, race, and religion, as well as disgusting or otherwise repulsive topics.   The campaign of President Barack Obama  was also frequently discussed in the count room, which led to racial tension. (Ex. 18 to Def.'s Mot.; Ex. E to Pl.'s Resp. at 250-52).  Bissett feels that the African-American employees began to dislike her, because they knew she did not support President Obama's candidacy.  (Ex. E to Pl.'s Resp. at 250-52).

Some of the employees also criticized Bissett's management style, claiming that she caused tension, reprimanded them in front of other employees, retaliated against employees that upset her, and threatened them with layoffs.  They also accused her of giving overtime to Caucasian employees, while sending the African-American employees (with the exception of Bonayog) home.  During the investigation, one employee stated:[1]

> Sending people home is unfair some [sic] people all the time.  Because I
> am told some are not qualified to do all the work.  In my mind its [sic] a

---

[1] When Human Resources took statements from Bissett's subordinate employees, it appears that each employee was asked a series of questions about Bissett. (*See* Ex. 21 to Def.'s Mot.) The employees' answers to these questions were hand-written by the Human Resources employees, and each count room employee reviewed and signed the notes taken by the Human Resources employees.  (*Id.*; Ex. F to Pl.'s Resp. at 22-25).  It appears at times that the Human Resources employees used shorthand while taking notes during their conversations with the employees; therefore these "statements" do not necessarily contain the employees' exact words. (*See* Ex. 17-29 to Def.'s Mot.)

black/ white thing and I do not like it.  I started to come to you a few months ago because of something said [sic] come on "niggers lets leave" this [sic] is the way the black people feel because it was a pattern and they were the ones to always go.

(Ex. 19 to Def.'s Resp.)

Bissett does not recall whether she made some of the alleged comments, but she claims that some of the comments were actually made by other employees but falsely attributed to her.  (*See, e.g.*, Ex. E to Pl.'s Resp. at 67, 130, 134-35).  For example, she cannot remember saying that an employee who had had an abortion had made a personal choice to kill her baby.  (*Id.* at 69).  She could not specifically recall whether she called employees worthless, and she used to call people stupid or retarded, but she has tried to stop using such language.  (*Id.* at 130, 146).

She claims that some of the other comments that employees complained about were taken out of context while others were actually made prior to the 2007 sexual harassment investigation.  She denies having a problem with a Caucasian employee dating African-American men but admits that she told Bonayog to watch out for a Caucasian female employee that flirted with all of the new African-American male employees, because she felt that the formation of close relationships among count room employees could create a risk of theft.  (*Id.* at 125-28).  She denies ever saying "Come on, niggers, let's leave."  (*Id.* at 124).  She denies calling an employee a bad mother or crackhead whore, but she admits that she called her sister-in-law this.  (*Id.* at 66, 133).  She admits that she told Bonayog that she hoped President Obama did not invite "vulgar rap stars" to the White House, because some of their music is "terrible."  (*Id.*

-5-

at 102).  She testified at her deposition that she believes that Bonayog had "Obama
issues." (*Id*.)  She also noted that Bonayog and an African-American female employee
became angry at her when she corrected them for calling the President by his first
name after he was elected.  (*Id*. at 107-08).  She does not deny indicating her fear of
reporting problems with an African-American employee that Bonayog had complained
about, or that she indicated that "black skin wins" in Human Resources at the Beau
Rivage.  (*Id*. at 128-29).  Finally, she claimed that she never limited overtime for any
employees until the Beau Rivage asked managers to cut back on overtime.  (*Id*. at 149).
She asserts that she did not consider her employees' skin color when making decisions
about who should receive overtime, but she merely considered the tasks that needed
to be done and the employees' respective abilities.  (*Id*. at 147-48).  She explained that
she usually needed employees who had strong computer skills to work overtime,
because computer-related tasks were performed at the end of the day.  (*Id*. at 145-46;
147-48).

Bissett claims that Bonayog was the catalyst for the investigation against her.
(*Id*. at 137).  She claims that the atmosphere in the count room was racially charged.
(*Id*.)  In addition, she felt that Bonayog became angry when she promoted a female
Caucasian employee named Kathi[2] to a lead position.  (*Id*. at 99, 101).  He told Bissett
that when she advertised the position, she should state that no women should apply,

---

[2] This employee's name is spelled different ways in the various depositions and in
paperwork generated by Human Resources.  When signing her statements, she spelled her
name "Kathi."  (Ex. 17, 18 to Def.'s Mot.)

because women are not strong enough to open some of the slot machines. (*Id.*) Bissett reprimanded Bonayog for this statement, and she also reprimanded him for being disrespectful to Kathi during a meeting about her promotion. (*Id.* at 113-15). She claims that Kathi was very frightened of the African-American employees and Human Resources, and thus, she would not report misconduct. (*Id.* at 167-68). In the six months to a year preceding her termination, Bissett perceived her working environment as hostile, because her employees' attitudes toward race changed and because Beau Rivage had "ramped up" its diversity agenda in the last few years. (*Id.* at 241-42).

On May 12, 2009, Rogena Barnes, Vice President of Human Resources, issued a memorandum to Bissett that terminated her employment. (Ex. 33 to Def.'s Mot.) Barnes found that Bissett had engaged in race discrimination by providing more overtime to Caucasian employees. Barnes stated that there was evidence to support an employee's claim that Bissett made the statement, "Come on, niggers, let's leave." She also found that Bissett had stated that she had problems with a Caucasian female dating African-American men, that people were going to get guns and shoot President Obama, and that black skin wins in Human Resources. Barnes also found that Bissett had created a hostile work environment by calling employees names, criticizing an employee for taking medical leave, and making offensive comments regarding race, gender, age, religion, and country of origin. Barnes further determined that Bissett had interfered with the investigation and violated the suspension pending investigation instructions by contacting employees. Finally, Barnes noted that she was

unable to conclude whether Bissett had retaliated against employees that upset her by giving them tasks that they were not trained to do.

Bonayog was promoted to Bissett's position after her termination. Bissett filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging race, sex, and age discrimination as well as retaliation. (Ex. A to Am. Compl.) After receiving notice of her right to sue, Bissett filed this lawsuit against Beau Rivage alleging age discrimination, sexual harassment, sex discrimination, race discrimination, retaliation, and a hostile work environment. (Ex. B to Am. Compl.; Am. Compl. at 8-9). Her claims are filed pursuant to Title VII, the Age Discrimination in Employment Act, and 42 U.S.C. § 1981. (*Id.*)

<h2 style="text-align:center">DISCUSSION</h2>

Any party to a civil action may move for summary judgment upon a claim, counterclaim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56. A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *Celotex Corp.*, 477 U.S. at 324-25. The non-moving party may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

256-57 (1986).

## I. Bissett's Race and Sex Discrimination Claims pursuant to Title VII and 42 U.S.C. § 1981

In order to set forth a prima facie case of employment discrimination under Title VII, a plaintiff must demonstrate (1) that she belongs to a protected class; (2) that she was qualified for the position; (3) that she suffered an adverse employment decision; and (4) that she was replaced by someone outside the protected class, or in the case of disparate treatment, that similarly situated persons outside her protected class were treated more favorably under circumstances that were "nearly identical" to hers. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001). If the plaintiff presents a prima facie case, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory justification for its actions." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881 (5th Cir. 2003). If the defendant offers such a justification, the burden again shifts to the plaintiff to show that either (1) that the defendant's alleged justification was a pretext for discrimination, or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. *Manning*, 332 F.3d at 881; *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). Section 1981 claims are analyzed under the same burden-shifting framework utilized for analyzing Title VII claims. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).

Beau Rivage argues that Bissett has failed to state a prima facie case, because she cannot demonstrate that any similarly situated person outside her protected class

were treated more favorably under situations that were nearly identical to hers. However, Beau Rivage omits the portion of the fourth element that permits a plaintiff to set forth a prima facie case by showing that she was replaced by someone outside of her protected class.  Bissett, a Caucasian female, has clearly demonstrated that she was replaced by an Asian/African-American male.  Thus, she has stated a prima facie case of both racial and gender discrimination.

As a result, the burden shifts to Beau Rivage to provide a legitimate non-discriminatory reason for Bissett's termination.  It contends that it terminated her because she created a hostile work environment for her employees, attempted to interfere with an investigation of her conduct, and made offensive and discriminatory remarks in the presence of her subordinate employees.  Thus, Bissett has the burden of demonstrating either pretext or a mixed motive for her termination.

"A reason is pretextual if it is false, 'unworthy of credence,' or otherwise unpersuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). Bissett attempts to demonstrate pretext in several ways.  First, she argues that Beau Rivage's reasons for terminating her are baseless, insufficient, and incorrect.  However, Beau Rivage's determinations were not baseless but were based on several employee statements.  Furthermore, as explained previously, Bissett does not deny making some of the inappropriate comments.  Furthermore, she does not deny that she typically denied African-American employees overtime; rather, she claims that they were not capable of performing certain tasks at the end of the day.  She even volunteered at her deposition that she felt an employee had "Obama issues" and that he became offended

when she assumed that President Obama may invite rap stars to the White House, presumably due to the color of the President's skin.

Nevertheless, even if Beau Rivage incorrectly determined that Bissett had made inappropriate and offensive comments to her employees, that does not demonstrate that Bissett was terminated due to her race or gender. *See Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (holding that an employer's honest belief in a non-discriminatory reason for discharge, even if incorrect, is not discrimination). Furthermore, employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of employment decisions nor . . . to transform the courts into personnel managers." *Equal Emp't Opportunity Comm'n v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995). Thus, employers are not required to make proper decisions, only non-discriminatory ones. *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005).

Second, Bissett argues that the Beau Rivage's true motive for terminating her is demonstrated by the manner in which the investigation was conducted. One example is Bissett's contention that Rogena Barnes incorrectly stated that there was conclusive evidence that Bissett said, "Come on, niggers, let's leave." Specifically, there is only one employee statement that mentions that this offensive comment was made, and that statement does not specifically attribute the comment to Bissett. (Ex. 119 to Def.'s Resp.) In fact, when read in context, the statement could be read to indicate that African- American employees made the statement after Bissett sent them home for the day. Counsel for plaintiff spent a significant amount of time at Barnes' deposition

attempting to disprove Barnes' determination that Bissett made this statement.  (*See* Ex. F to Pl.'s Resp. at 88-98).  Although Barnes admitted that no other employee made the allegation and she even indicated that other employees may have made the statement, she refused to recant her finding that Bissett made the statement. (*Id.*) Bissett also points out that Barnes contacted Bissett's supervisor, Ellis, and asked him to add a note to Bissett's employment file concerning a complaint made about Bissett ten months previously.  Bissett argues that Barnes' initial actions in attributing the "Come on" comment to Bissett and in adding complaints to her personnel file constituted manufacturing of evidence, and her refusal to correct her mistake at her deposition demonstrated that her true motivation in terminating Bissett was discriminatory in nature.

Furthermore, Bissett argues that Barnes and Human Resources did not investigate or question the following statement made by Bonayog during the investigation, "We have all talked and don't feel like Rachel can change.  We're afraid that if she does come back that we will all be targeted."  (Ex. 27 to Def.'s Mot.)  Barnes admitted at her deposition that Human Resources should look into indications that employees have been discussing a confidential Human Resources investigation.  Bissett argues that Barnes failed to investigate the possibility that Bissett's subordinate employees had conspired to get her fired and failed to investigate other allegations concerning Bonayog that she included in her statements.  Thus, Bissett claims that Barnes, by failing to conduct a complete and independent investigation, was a mere rubber stamp or cat's paw of the subordinate employees' allegations.

The Fifth Circuit has held that "[i]f an employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker . . . .' If the [formal decisionmakers] acted as the conduit of [the employee's] prejudice – his cat's paw – the innocence of the [decisionmakers] would not spare the company from liability.'" *Bryant*, 413 F.3d at 477 (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226-27 (5th Cir. 2000). "To invoke the cat's paw analysis, [the employee] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited [discriminatory animus], and (2) that the same co-worker possessed leverage, or exerted influence, over the titular decisionmaker." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004).

The Court finds that Bissett has not demonstrated that her subordinate employees had a discriminatory animus toward her. With regard to her race discrimination claim, Bissett made vague references to a racially-charged atmosphere. She claimed that a female employee sent a text message to several employees in which she referred to President Obama as "our boy" and encouraged them to go vote for him. She also noted that the African-American employees referred to the President by his first name, and that they became offended or accused her of trying to bring President Obama down when she criticized him or expressed fears that he would invite rap stars to the White House. She also claims that they considered her a racist, because she did not support President Obama. These incidents and statements merely indicate that the employees disagreed with Bissett's political views. Furthermore, it was not

unreasonable for the employees to be upset or offended by some of Bissett's statements. The Court cannot determine from the evidence that Bissett's fellow employees had a racial animus toward her.

As for Bissett's gender discrimination claim, Bissett claims that Bonayog had a gender animus, because he did not want her to promote a female employee to the lead position and he treated this employee with disrespect.  However, Bissett has not presented any testimony or evidence that indicates that Bonayog held a gender animus toward Bissett herself.  In fact, with regard to Bonayog, Bissett's allegations would tend to show at the very most that he became angry at her due to her political views and that he retaliated by reporting offensive remarks that she had made.  The mere fact that Bonayog may have wanted her job or may have disliked her does not demonstrate that he harbored a discriminatory animus toward her.

In addition, Bissett claims that Beau Rivage's diversity policy was a motivation for her termination.  The policy provides, "Our company is committed to maintaining a workforce that reflects the diversity of our community." (Ex. G to Pl.'s Resp. at 234). At her deposition, Barnes testified that Beau Rivage does look at race when hiring people, although it looks at race "in its proper context." (Ex. F to Pl.'s Resp. at 8).  She admitted that if the percentage of African-American employees working at Beau Rivage was less than the percentage in the community, they would look for and recruit more African-American employees.  (*Id.* at 9).  She explained:

> Well, if we just look at just the best person for the job, the skin color, we may not have diversity.  We think it's important for our business.  It is a business imperative.  We have guests that are diverse.

-14-

We have guests who come into our business who ask about people that are like them.  We want to make sure that our business is representative.

If we do not have those numbers, of course, we go out, we do look for them, yes.  But in our effort to find people, we keep it in its proper context.  When we bring people on board it's based on the competencies and needs for the position.

(*Id.* at 10).  Furthermore, Bissett testified that she once overheard a Human Resources employee say that the next slot supervisor needs to be black.  (Ex. E to Pl.'s Resp. at 248).  However, there is no evidence that would tend to show that Human Resources terminated Bissett in an effort to advance its diversity goals.  Bissett's arguments in this regard are entirely speculative.

In the alternative, Bissett argues that her race was at least a factor in her termination, even if Beau Rivage's proffered reason for terminating her was truthful.  Once again, there is no evidence that Bissett's race or gender was a factor in her termination.

Although Human Resources' investigation was most likely flawed to some degree, the evidence demonstrates that Human Resources was faced with serious allegations of discriminatory and unprofessional conduct on behalf of Bissett, much of which she does not deny.  Bissett's subjective belief that she was terminated due to her race or gender is insufficient to create a genuine issue of material fact.  *See Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994) ("[G]eneralized testimony by an employee regarding his subjective belief that his discharge was the result of [] discrimination is insufficient to make an issue for the jury in the face of proof showing an adequate, nondiscriminatory reason for his discharge."); *see also Ray*

*v. Tandem Computers, Inc.*, 63 F.3d 429, 435 (5th Cir. 1995) ("[B]ald assertions of . . . discrimination are inadequate to permit a finding that proscribed discrimination motivated [the defendant's] actions against [the plaintiff]").   Finally, Bissett 's argument that the investigation into her conduct was inadequate is insufficient to demonstrate pretext, because discrimination laws "address[ ]only discrimination, not general unfairness in employment relationships." *Arey v. Watkins*, 385 Fed. Appx. 401, 404 (5th Cir. 2010) (citing *LeMaire v. La. Dep't of Transp. & Dev. ex rel La.*, 480 F.3d 383, 391 (5th Cir. 2007)).   Therefore, the Court finds that Bissett has not demonstrated the existence of a genuine issue of material fact regarding either a pretext theory or a mixed motives theory concerning her gender and race discrimination claims.   As a result, the Court finds that Beau Rivage is entitled to summary judgment concerning those claims.

## II.  Bissett's Age Discrimination Claim

The Age Discrimination in Employment Act provides: "It shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's age."   29 U.S.C. §623(a)(1).   A plaintiff relying on circumstantial evidence in support of her age discrimination claim must first set forth a prima facie case of age discrimination by demonstrating: (1) that she was discharged; (2) she was qualified for the position at issue; (3) she was within the protected class (at least forty years of age); and (4) she was replaced by someone younger or outside the protected class, or otherwise discharged because of her age.

*Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007); *see also* 29 U.S.C. §631(a).  As with race and gender discrimination claims, once a plaintiff has set forth a prima facie case of age discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the termination.  *Berquist*, 500 F.3d at 349. If the defendant articulates such a reason, the burden shifts back to the plaintiff to demonstrate the existence of a genuine issue of material fact that the reason given is merely pretextual.  *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010).

Bissett has set forth a prima facie claim for age discrimination, and once again, Beau Rivage has provided a legitimate, non-discriminatory reason for her termination. In support of her claim that Beau Rivage's reason was pretextual, Bissett relies on the same arguments discussed with regard to her gender and race discrimination claims. Bissett has produced no evidence that her age was in any way a factor in her termination, and there is no evidence that any of the Human Resources or count room employees harbored an animus with regard to Bissett's age.  Beau Rivage's reason for terminating Bissett was supported by evidence and legitimate concerns as to the manner in which she treated her subordinate employees.

### III. Bissett's Hostile Work Environment Claim

To state a hostile work environment claim, under Title VII, a plaintiff must show that: (1) the victim belongs to a protected group; (2) the victim was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the victim's employer knew or should have known of the harassment and failed to take

prompt remedial action.  *Equal Emp't Opportunity Comm'n v. WC&M Enter., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).  For harassment to be sufficiently severe and pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive. *WC&M Enter.*, 496 F.3d at 399.  "Although 'discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive' to support evidence of a Title VII violation, 'simple teasing, offhand comments, and isolated incidents, (unless extremely serious) will not amount to discriminatory charges' that can survive summary judgment."  *Turner v. Baylor Richardson Med. Ctr*, 476 F.3d 337, 347-48 (5th Cir. 2007)(quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995); *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004)).

First, Bissett argues that the manner in which the 2007 investigation of her sexual harassment claims was handled created a hostile work environment for her. It appears that Bissett failed to exhaust her administrative remedies as to this portion of her hostile work environment claim, because she failed to file an EEOC charge within 180 days. *See* 42 U.S.C. §2000e-5(e)(1). Moreover, the sexual harassment claim was promptly handled by Human Resources, and Bissett admitted that the sexual harassment ceased after Human Resources' investigation.  The fact that Human Resources began an investigation into Bissett's own sexual comments once they were reported by employees does not support her hostile work environment claim; rather, Human Resources felt that it had a duty to investigate the allegations made against

Bissett just as it had a duty to investigate her own allegations.  There was no indication that Bissett was disciplined for her comments, but she was discouraged from making such comments in the future.

Second, Bissett argues that the 2009 complaints and investigation created a hostile work environment.  However, there is no evidence that Bissett was subjected to harassment, ridicule, or insults; rather, the evidence indicates that Bissett was subjecting her employees to such behavior.  Bissett's allegations that the investigation was not conducted properly does not support a hostile work environment claim.  The allegations made against Bissett were serious, and while some of the allegations may have been unfounded, there are others that Bissett does not deny.  Human Resources merely questioned Bissett's employees, and there is no evidence that she was treated in a demeaning manner.  As for Bissett's complaints that the discussions concerning President Obama caused racial tension, she was the manager of the count room, and there is no indication that she ever attempted to address the situation with her employees other than telling them that they should not refer to the President by his first name.  In fact, the evidence before the Court indicates that Bissett either began or participated in these political discussions, as well as other discussions of an inappropriate nature.  As a result, if there was a hostile work environment, Bissett either created that environment or exacerbated it.  Therefore, the Court finds that Beau Rivage is entitled to summary judgment concerning Bissett's hostile work environment claim.

## IV.  Bissett's Sexual Harassment Claim

To the extent that Bissett intended to assert a separate claim for sexual harassment, she has failed to exhaust her administrative remedies.  There is no indication that she has ever filed an EEOC charge asserting sexual harassment.  *See* 42 U.S.C. §2000e-5(e)(1).  Furthermore, as this Court has previously explained, Beau Rivage took prompt immediate action regarding Bissett's claim of sexual harassment. *See DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) (explaining that a plaintiff must demonstrate "that the employer either knew or should have known of the harassment and failed to take prompt remedial action").

## V.  Bissett's Retaliation Claim

Bissett argues that her 2009 termination constituted retaliation for her 2007 complaint of sexual harassment.  To establish a prima facie case of retaliation, a plaintiff must show that: (1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the materially adverse action. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008).  "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate . . . non-retaliatory reason for its employment action." *Aryain*, 534 F.3d at 484 (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007)).  If the employer satisfies this burden, the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason. *Id.*

There is no evidence that a causal connection exists between Bissett's 2007 sexual harassment allegation and her 2009 termination.  In her brief in opposition to the motion for summary judgment, Bissett merely adopts her prior arguments concerning the prima facie case for race and gender discrimination.  She also claims that she has independent evidence of retaliation, the most recent occurring "when [Human Resources] recreated the Spanish Inquisition," which is presumably a reference to the 2009 investigation of Bissett.  Although Bissett claims that she has provided evidence of a causal connection between the 2007 and 2009 incidents, she has not specified what that evidence is.  The Court is not required to search through the forty-five page brief and the 384 pages of exhibits that she has provided in an effort to locate the evidence that she believes demonstrates the causal connection.  However, the Court has thoroughly reviewed all of the evidence and briefs provided by both parties, and it sees no connection between the 2007 and 2009 incidents, aside from the fact that some of the subordinate employees made similar complaints about Bissett's conduct during both investigations.

As a result, the Court finds that Bissett has not demonstrated a prima facie case of retaliation.  Nevertheless, even if Bissett had set forth a prima facie case, the Court also finds that she cannot rebut Beau Rivage's legitimate, non-discriminatory reasons for terminating her.  The evidence before the Court demonstrates that Beau Rivage's reasons for termination were valid and were supported by evidence.  Therefore, Beau Rivage is entitled to summary judgment regarding Bissett's retaliation claim.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion for

Summary Judgment [43] filed by Beau Rivage Resorts, Inc., is **GRANTED**.  This lawsuit is hereby **DISMISSED WITH PREJUDICE**.

**SO ORDERED AND ADJUDGED** this the 16th day of March, 2011.

*s/ Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE